**ARMADA SUPPLY INCORPORATED, Plaintiff,**

v.

**Philip Gaybell WRIGHT, et al., Defendants.**

**No. 83 Civ. 3182.**

United States District Court, S.D. New York.

July 10, 1987.

As Amended Aug. 18, 1987.

George Graff, Milgrim Thomajan Jacobs & Lee, New York City, for plaintiff.

Richard A. Hagen, Crowell, Rouse, Varian, Hagen & Matera, New York City, for defendants.

## OPINION

GRIESA, District Judge.

This is an action to recover insurance on a cargo of fuel oil shipped from Rio de Janeiro to New York. The action has been tried to the court without a jury. This opinion constitutes the court's finding of fact and conclusions of law.

Armada purchased the oil from Petrobras, a Brazilian company. This being a C.I.F. sale, Armada took title in Rio and Petrobras obtained marine insurance for the benefit of Armada from defendant Banorte and other Brazilian underwriters. Prior to the time of the voyage, Armada contracted to sell the cargo of oil to Sun Oil Trading Corp. Sun was to take delivery (and title) in New York. Thus, Armada was at risk during the voyage from Rio to New York.

Armada obtained certain marine insurance coverage of its own from London underwriters, the precise extent and nature of which is in dispute.

The principal problem giving rise to the insurance claims results from the fact that the crew of the vessel (named the AGIOS NIKOLAS) used part of the cargo for fuel and then pumped sea-water into the cargo tanks. This resulted in the contamination of the cargo and a shortage of actual oil. Because of this situation Armada lost the contract with Sun, except for a portion of the cargo which was sold to Sun at a discount. As to the rest of the contaminated cargo, it was put through reconditioning processes and sold to various purchasers at prices less than the original contract price to Sun.

Aside from the misappropriation of oil and the resulting contamination with sea-water, there was a shortage in the oil arising at the time of the loading in Brazil.

Armada makes claims against both Brazilian and the London underwriters for the shortages and the contamination. In addition, Armada seeks to recover from both groups of underwriters expenses related to its efforts to recondition and sell the contaminated cargo.

Armada has named defendants in this action as certain representatives of the London underwriters. It is conceded that a judgment against these representatives will bind all the London underwriters. As to the Brazilian underwriters, Armada has named all of them as defendants. The lead underwriter, Banorte, has been served. Some, but not all, of the participating Brazilian underwriters have been served.

## I

### ISSUES PRESENTED

As to Armada's claims against the London underwriters, Armada first contends that it obtained "contingency coverage," which makes London underwriters liable for the amount of the primary Brazilian insurance in the event the Brazilian underwriters fail to pay. London underwriters argue that Armada did not comply with the

requirement in the London insurance document (the "cover note") for obtaining contingent coverage. Armada contends that even if this is so, nevertheless London underwriters, or their agents, accepted and retained a premium for this coverage, and thus waived the requirement of the cover note. London underwriters deny such a waiver.

Armada makes a claim against London underwriters for an amount over and above any amount payable on the primary insurance. This claim is made under the "increased value" coverage in the London insurance. Armada contends that the proper interpretation of the increased value coverage has the effect of making London underwriters liable for the entire amount of the contract price with Sun, less what is recovered on the primary Brazilian insurance. Thus Armada contends that this was insurance against the risk of loss of profits on the contract with Sun. Armada claims that it is entitled to recover $1,416,000 or, alternatively, $794,842 under the increased value coverage. The basis for these proposed figures will be described hereafter. London underwriters deny Armada's contentions and urge that they are liable, at most, for only about $100,000. They contend that the increased value coverage did not insure against loss of profits, but, like the underlying Brazilian insurance, only covered against the risk of physical loss or damage to cargo. The London underwriters argue that the function of the increased value insurance was to increase the insured value over and above what it was under the Brazilian insurance. As to the contamination loss component of Armada's claim, London underwriters contend that the particular average method of adjustment should be used, under which a percentage of about 10–12% would be applied to the insured value stated in the Brazilian insurance and the increased value in the London insurance.

Armada contends that even if the normal interpretation of the cover note would not allow recovery for loss of profits, nevertheless there was a separate agreement to provide such coverage for this cargo. Armada argues that it obtained such an agreement from a broker, Johnson & Higgins. London underwriters deny that Johnson & Higgins had either actual or apparent authority to bind them to terms of coverage, and in any event denies that Johnson & Higgins purported to make such an agreement.

With regard to the Brazilian insurance, it appears that a shortage arose in the pipeline between the Petrobras tanks and the vessel. There is an issue as to whether the Brazilian insurance covered the transit in the pipeline.

There is also an issue as to when the Brazilian insurance terminated. When the vessel arrived in New York, not all of the cargo tanks were contaminated. However, the vessel pulled out of New York harbor temporarily. This involved a scheme by the vessel owners to avoid legal process. By the time the vessel returned, the contamination affected all the cargo tanks, and there was an additional shortage. Brazilian underwriters contend that their coverage terminated when the vessel first arrived in New York. Armada argues that the coverage continued while the vessel was temporarily away from New York.

Armada contends (although not with great force) that, as to the shortage and contamination problem arising from the derelictions of the crew, there is no need to assess precise losses from the actual shortage and the actual contamination because the cargo should be deemed a constructive total loss.

Assuming that the constructive total loss theory is rejected, Armada must prove the quantum of its contamination loss under the particular average method of adjustment. The principal issue here relates to whether the oil still had some residual contamination following reconditioning, and if so what was the damaged value.

Armada contends that the oil did have residual contamination, and that the damaged value should be measured by the sale prices of the various lots of oil following the reconditioning. Underwriters contend that, although this is true for some portions of the cargo, as to other portions, they were rendered sound or close to sound by the reconditioning and Armada improvi-

dently accepted prices which did not reflect the actual condition of the oil. Underwriters contend that, as to these portions of the cargo, Armada cannot recover because it has failed to prove that the oil was contaminated, or at least has failed to prove the damaged value.

Armada seeks to recover substantial sue and labor expenses from both the Brazilian and London underwriters. The Brazilian underwriters deny liability for certain items. The London underwriters assert that they have no liability whatever for sue and labor expenses.

Before proceeding further, a word should be said about the matter of choice of law. In this case, as so often happens, choice of law makes little or no difference.

■ Questions about the interpretation of marine insurance policies are generally to be decided under local law, rather than as a matter of admiralty law. *Wilburn Boat Co. v. Fireman's Fund Insurance Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955). The same is obviously true of certain other questions, such as issues about the authority of a broker. The present case has substantial contacts with Texas (the location of Armada and its broker), England (the location of the London underwriters), Brazil (the starting point of the voyage and the location of the Brazilian underwriters), and New York (the termination point of the voyage).

The fact is that on the issues relevant to this case, there is no showing that there would be any material difference in the law of any of these jurisdictions. The parties have cited authorities from whatever sources are available. These will be discussed in due course.

## II

### SUMMARY OF RULINGS

The London underwriters are not liable for contingency coverage. Armada did not comply with the requirement of the cover note. Underwriters did not waive this requirement.

Armada did obtain increased value coverage from the London underwriters. But this coverage did not insure the lost profits on the Sun contract. The increased value insurance covered physical loss or damage, not the loss of a contract or the profits thereon. It served to increase the amount of the insured value over and above the amount provided in the primary Brazilian insurance. The particular average method of adjustment applies to the contamination loss claim.

Johnson & Higgins did not make an agreement binding the London underwriters to a different interpretation—*i.e.,* to coverage of the lost profits on the Sun contract. Johnson & Higgins had neither actual nor apparent authority to do so. Moreover, Johnson & Higgins did not purport to make such an agreement.

As to the Brazilian insurance, there was coverage for the loss occurring in the pipeline in Rio. In New York the coverage did not terminate until the vessel returned to New York from its temporary flight.

Armada is not entitled to treat the cargo as a constructive total loss. It is required to prove its actual shortage losses and actual contamination loss.

The details of these calculations will be set forth later in this opinion. It is sufficient to say at this point that there is no substantial dispute as to the method of calculating the shortage losses. As to the contamination loss, Armada's recovery is limited to some extent because the court agrees with underwriters that certain portions of the oil had no residual contamination and, as to certain portions which had residual contamination, Armada has not proved the damaged value.

Regarding sue and labor expenses, the London underwriters are not liable. The Brazilian underwriters are liable for proper sue and labor expenses. Some of the items claimed by Armada are allowed. Some are denied. The details are set forth later in this opinion.

## III

### FACTS RELEVANT TO LONDON INSURANCE

#### A. *Armada-Petrobras Contract*

Plaintiff Armada Supply Incorporated, a Texas corporation, was formerly in the oil

trading business and had its principal place of business in Houston. On April 29, 1982 Armada contracted with a subsidiary of Petroleo Brasileiro S.A. ("Petrobras") to purchase up to 330,000 metric tons of fuel oil. The sales were to be C.I.F. port of delivery. This meant that Armada would take title at the port of origin, Rio de Janeiro, but Petrobras would pay the freight to the destinations and would purchase marine insurance covering the voyages. The oil was to be shipped in cargoes of about 55,000 metric tons each. Armada had the option to have cargoes shipped to Rotterdam or New York. The prices were not fixed in the contract, but were to be established pursuant to an index of spot oil prices at the time and place of delivery.

The cargo in question in the present case was the last shipment under the April 1982 contract. It was loaded on November 16, 1982 at Rio de Janeiro on the AGIOS NIKOLAS destined for New York. The amount supposed to be loaded was 52,066 metric tons or about 348,000 barrels. The bill of lading specified this amount. It appears that a shortage of about 8,000 barrels occurred in the pipeline between the shore tanks and the vessel. About 340,000 barrels were loaded on the AGIOS NIKOLAS.

The vessel entered New York harbor on December 9, 1982. At that time a problem of contamination was discovered. This was followed by a temporary departure of the vessel from New York harbor in order to avoid legal process, which in turn led to a complex series of transactions to be described later in this opinion.

### B. *Armada-Sun Contract*

On October 29, 1982, prior to the time the cargo in question left Rio de Janeiro, Armada entered into a contract to sell the cargo of oil to Sun Oil Trading Corp. The contract specified that Armada was to sell 49,000 metric tons, plus or minus 10% at Armada's option, on a delivered basis in New York. This meant that Sun would take title in New York, and the oil was Armada's risk until then. The price was fixed at $30.55 per barrel.

It soon became apparent that the Sun contract would be highly profitable to Armada. The market price of oil was steadily declining. The flexible price under the Armada-Petrobras contract would allow Armada to acquire for substantially less than the $30.55 fixed price in the Sun contract. As it turned out, the spot oil price in New York at the time of the arrival of the AGIOS NIKOLAS was $25.70 per barrel. Had Armada been able to consummate the transaction with Sun it would have earned a profit of $4.85 per barrel or a total profit of about $1.6 million.

Due to the contamination of the oil discovered upon arrival at New York on December 9, Sun would not accept the cargo at the $30.55 price. Armada and Sun renegotiated the price and on December 16 agreed upon $27.40 per barrel. However, for reasons to be described, only about 49,000 barrels were delivered at this reduced price. Since the rest of the oil was not delivered to Sun by December 20, Sun rejected the remainder of the cargo on that date. Except for the sale of the 49,000 barrels at the reduced price, the Sun contract was lost.

### C. *Brazilian Insurance*

Petrobras had an open marine insurance policy with Banorte and other Brazilian underwriters covering shipments of oil. The Brazilian insurance policy was subject to the London Institute Cargo Clauses (All-Risks). It covered the type of losses from shortage and contamination involved in the present case. On December 14, 1982 the Brazilian underwriters issued an Insurance Certificate covering the cargo in question. It recited that the quantity of oil insured was 52,066 metric tons. The certificate recited the sale price of the oil to Armada, $8,959,394, and added 10% to arrive at the insured value of $9,855,333. The insured value under the Brazilian insurance was $28.27 per barrel. This is equal to the $25.70 spot price in New York plus 10%.

### D. *London Insurance*

#### 1. *Language of Cover Note*

Armada had an open policy of marine insurance with London underwriters. This

coverage was renewed for the period April 20, 1982 to April 19, 1983. In connection with its London insurance, Armada dealt with its Houston broker, Johnson & Higgins, which in turn dealt with a London broker, Willis Faber & Dumas, Ltd. The London insurance coverage for April 1982 —April 1983 was reflected in a cover note sent by Willis Faber to Johnson & Higgins dated July 15, 1982. The cover note is the document relied on in the present case to express the relevant terms of the London insurance. It was applicable to the cargo on the AGIOS NIKOLAS.

The cover note named certain Armada entities other than plaintiff Armada Supply Incorporated, but it has been stipulated that plaintiff is the assured or beneficiary in regard to this insurance.

The cover note provided "continuous cover" for shipments occurring between the dates specified. It was obviously understood by Armada and the London underwriters that Armada might have different degrees of interest in different cargoes. For instance, Armada might purchase F.O.B. a foreign port, thus taking title in the foreign port and being required to purchase its own marine insurance for the voyage. On the other hand, as in the present case, Armada might make a C.I.F. purchase, taking title in the foreign port but having insurance purchased for it by the seller. In such a case, if Armada was satisfied with the marine insurance provided by the seller, it would not obtain insurance of its own. However, Armada might resell the oil on a C.I.F. basis and be required to provide marine insurance to its purchaser. Armada might resell the oil on a non-C.I.F. basis, but wish to increase the insured value to take into account the resale price. The cover note of July 1982 made provision for these different possibilities.

There was provision for ordinary marine insurance, for which the premium was .105% of the insured value. This was apparently intended to apply only where Armada purchased F.O.B. a foreign port, although the cover note did not expressly state this.

There was a provision covering the situation where Armada purchased on C.I.F. terms and resold on C.I.F. terms, and was therefore required to provide insurance coverage to its purchaser. It was provided that, upon a payment of one-quarter of the regular marine rate (.02625%), the London insurance would cover the full value of the original supplier's insurance. The London underwriters would become subrogated to Armada's rights on the original insurance. This was referred to as "contingency" coverage. As part of the contingency coverage, it was provided that any increased value represented by Armada's resale of the oil would be added to the insured value. Armada was to pay the marine premium rate of .105% on the increased value. The relevant provision of the cover note was as follows:

> C.I.F. PURCHASES: It is agreed that where the Assured purchase goods on C.I.F. terms and sell on C.I.F. terms, but wish to give their buyer a certificate for their Sales Price that they may issue certificates for the full value hereunder.
>
> Underwriters hereunder to have the benefit of the original suppliers certificates held by Wills Faber & Dumas Ltd.
>
> Surveys in the event of loss and/or damage to be conducted by the Agent specified on the original suppliers certificate in order to preserve Underwriters rights of recourse thereunder.
>
> This insurance not to be deemed a double insurance.
>
> *Premium payable as follows:*
>
> (1) Where the original suppliers certificate is in force for the entire period of risk:—
>
> (a) *Marine:*
>
> Rate(s) as per cover payable on the Increased Value, if any, which see (3) below.
>
> (b) *Contingency:*
>
> 0.02625% payable on the full value of the original suppliers certificate(s) but at rates to be agreed where the conditions on the original suppliers certifi-

cate(s) are narrower than those on the certificate(s) issued hereunder.

The next clause in the cover note dealt with the situation in which Armada purchased on C.I.F. terms and resold on non-C.I.F. terms, with the result that Armada was not providing insurance for its buyer but was itself the beneficiary of the insurance during the voyage. This clause provided insurance for Armada for the increased value arising from the non-C.I.F. resale. The clause also provided insurance for increased value arising from rising market value without a resale. This insurance was mandatory on all cargoes purchased C.I.F. by Armada. The premium on this increased value coverage was .01%, payable on all cargoes purchased C.I.F. by Armada. The percentage was levied on the contract price of the C.I.F. purchase. The relevant provision was:

INCREASED VALUE IN RESPECT OF C.I.F. PURCHASES: It is also agreed that, in respect of interest bought on C.I.F. terms, this insurance is extended to cover, on concurrent conditions, increased value which may occur during the period of this insurance, it being understood and agreed that, in the event of the vessel or interest being lost, the period of cover for ascertainment of increased value shall be the period between commencement of risk and the estimated time of arrival at port of destination.

The sum insured shall be:—

(a) *If bought against sales:* The difference between the sum insured by seller(s) and the sum stipulated in the sales contract or, if required by the buyer(s) the highest market value reached during the period defined above.

\*　　\*　　\*　　\*　　\*　　\*

*Additional Premium:* 0.01% payable on the contract purchase price of all shipments attaching hereunder.

The amount of the increased value on the AGIOS NIKOLAS cargo was the difference between the amount of the Sun contract ($10,650,175) and the sum insured by

Petrobras ($9,855,333), or $794,842. This is $2.28 per barrel.

The increased value coverage involved in the second of the quoted provisions should not be confused with the increased value feature of the contingency coverage. Regarding the terminology in this opinion, "increased value coverage" will refer to the coverage under the second provision.

It is important to understand the relationship between the contingency coverage and the increased value coverage. Some recapitulation and elaboration is in order. The increased value coverage was automatic for all shipments, and the .01% premium was to be paid on all shipments. The provision contemplated that Armada would have primary insurance supplied by its C.I.F. seller. Armada would benefit from the increased value coverage on a particular cargo if it retained ownership of the cargo, and was itself at risk, during the voyage, and if the value of the cargo increased by virtue of rising market value or a resale of the cargo. The type of resale contemplated here was one in which Armada had a contract to deliver at the destination, and retained title during the voyage.

The contingency coverage related to a different situation. If Armada bought C.I.F. and resold C.I.F. before the voyage, it would not have title, and would not be at risk, during the voyage. It would need to provide its purchaser with insurance covering the total value of the cargo. Armada might do this by giving its purchaser two certificates of insurance, one involving an assignment of the primary insurance and the second for the increased value, bringing the insured value up to the amount of the resale price. However, this might have certain disadvantages, particularly the disclosure of the profit on the resale contract. Therefore Armada might wish to give its seller a single certificate of insurance covering the full value. This is the situation provided for by the contingency coverage in the July 1982 cover note. This coverage was not automatic, but came into effect only in the event of back-to-back C.I.F. sales and an appropriate exercise of Armada's option to obtain this coverage. Arma-

da would then issue a certificate to its seller. It would be Armada's buyer who would be the beneficiary of the insurance, and not Armada. The buyer would be covered, not by the original supplier's insurance (such as that obtained in Brazil by Petrobras), but by the London insurance. In the event of a loss, the London underwriters would be subrogated to Armada's rights under the original insurance.

A comparison of the features of the contingency coverage and the increased value coverage is contained in the following table.

| | Contingency | Increased Value |
|---|---|---|
| C.I.F. sales | Back-to-back C.I.F. sales: original supplier to Armada, then Armada to its buyer | Only one C.I.F. sale—*i.e.*, to Armada |
| Risk during voyage | Armada's buyer | Armada |
| London insurance coverage | Entire value | Increased value only |
| Beneficiary London insurance | Armada's buyer | Armada |
| Beneficiary original supplier's insurance | London underwriters | Armada |

### 2. *Amounts Claimed by Armada on Increased Value*

As described earlier, Armada contends that the increased value provision insured it against loss of profits on the Sun contract. The amount of the profit (the Sun contract price less the Petrobras contract price) would have been $1,690,780 if the Sun contract had been consummated. However, this is not the amount of the increased value under the formula set forth in the cover note. As already stated, that amount is $794,842. Under the cover note, the increased value is not to be based upon the amount of the Petrobras *contract*, but upon the *sum insured* by Petrobras. This was the contract price plus 10% (this 10% being about $800,000).

Armada does not even argue that it should recover the actual lost profit, $1,690,780, from the London underwriters. It makes two other alternative arguments. The first of these was articulated in its opening statement at the trial. There Armada argued that it should recover from the London underwriters the difference between the amount of the Sun contract and the net amount realized from the damaged cargo (both from resales of contaminated oil and from the Brazilian insurance). The following figures were presented:

| | |
|---|---|
| Net amount of resale after expenses | $6,557,000 |
| From Brazilian insurance | 2,676,000 |
| | $9,233,000 |

Subtracting the latter figure from the amount of the Sun contract ($10,650,175), and rounding off, gives $1,416,000. In the opening statement Armada argued that this was the amount of the sum insured under the increased value provision of the cover note, and this is the amount which should be recovered against London underwriters.

This argument can be readily disposed of. The proper calculation of the sum insured under the increased value insurance is what was set forth earlier in this opinion resulting in the figure of $794,842. The method of calculation proposed in Armada's opening statement is contrary to the plain language of the provision in the cover note.

An alternative argument has been made in recent presentations to the court. Armada contends that it is entitled to recover the $794,842 from the London underwriters. The problem with this argument is that, although this is the correct figure under the cover note formula, it does not represent a loss of profit; and it is the theory about insurance against loss of prof-

its that is the sole rationale used by Armada to justify an amount of this magnitude rather than the $100,000 or so argued for by the London underwriters. Armada's response to this problem is that the increased value provision insures all its profit on the Sun contract over and above the 10% portion of those profits included in the insured value under the Brazilian insurance.

This is a most untenable position. There is nothing in the language of the cover note which approaches a definition of this kind of insurance—*i.e.*, insurance against a portion of lost profits. A strong argument can be made for rejecting this position out of hand. However, the parties in this case have gone to great effort to present evidence and argument about what they consider a somewhat basic issue—*i.e.*, the general question of whether the insured value provision did or did not provide insurance against loss of profits. They have also presented arguments on the related question of whether the particular average method of adjustment applies. The various contentions of the parties in this regard will now be dealt with.

### 3. *Evidence About Interpretation of Increased Value Coverage*

The London underwriters called two witnesses, Christopher Parker and John M. Blackwell, to testify about the customary method of adjustment of claims where there is increased value coverage. Parker is with the London insurance broker Willis Faber, and has long experience in both the placement and claims aspects of the marine insurance business. Blackwell is employed at Lloyd's in the adjustment of insurance claims. The following is a summary of their testimony, together with certain inferences drawn by the court on the basis of that testimony.

They testified that the basic concept of marine insurance is that it insures against the risk of physical loss of the cargo or physical damage to the cargo. In the event of such loss or damage, the insured's claim will be adjusted and paid on the basis of the extent of that loss or damage. For instance, if 10% of a cargo is lost by being jettisoned, then the adjustment and payment will be on the basis of this 10%.

Parker and Blackwell also testified about the concept of a "valued policy." This is a policy in which the "insured value" is agreed upon, rather than being subject to estimation after the loss has occurred. In the event of loss or damage to the extent of 10%, the amount to be paid to the insured would be 10% of the insured value. This is quite different from insuring against the failure to complete a *contract* or the failure to earn profits on a contract. This difference is illustrated by the following examples.

First, assume insurance on a cargo of 100,000 barrels of oil. The owner of the cargo has a contract to sell it for $20 per barrel, or a total of $2 million, and the contract provides that if all 100,000 barrels are not delivered, the contract is void. The policy states that the insured value is $20 per barrel, or a total of $2 million. Due to a casualty at sea, 10,000 barrels are lost. Under standard marine insurance concepts, involving the theory that the insurance is against the loss of physical property, the amount to be paid on the claim is the insured value of the 10,000 barrels lost, or $200,000. If, on the other hand, the insurance were to be construed as protecting against the loss of the contract, the amount to be paid would be $2 million, since the entire contract was lost as a result of the 10,000 barrel shortage.

In the second example, again assume an insured cargo of 100,000 barrels of oil, which is subject to contract of sale for $20 per barrel or a total of $2 million. The contract provides that if there is salt water contamination of more than 2%, the contract is void. The insured value is agreed to be the $20 per barrel or a total of $2 million. A casualty occurs at sea and the cargo is contaminated with salt water to the extent of 12%, which reduces the value of the oil by 10%. Under standard concepts, a claim would be paid representing the amount of physical loss or deterioration of the cargo. This would be 10% of $2 million, or $200,000. On the other hand, if the insurance were construed to cover the

risk of the loss of the contract, the amount to be paid would be $2 million, because the entire contract was lost.

According to the testimony of Parker and Blackwell, the July 1982 cover note provided standard marine insurance against loss of cargo or damage to cargo, and did not cover loss of a contract.

Parker and Blackwell testified that "increased value" coverage, of the kind provided in the cover note, has no other function than to increase the insured value beyond what is insured under the primary insurance. If the increased value is based upon a resale contract, the amount of that contract will be used as a basis for establishing the increased value. However, this does not mean that the contract as such, or the profit under the contract, is insured. Where there is a primary policy and an increased value policy, there are *two* insured values. In the event of loss or damage, liability would be shared by the two insurers.

Let us return to the two hypothetical cases, and suppose that there are two policies—a primary policy with an insured value of $1.50 per barrel or a total of $1,500,-000, and an increased value policy for $.50 per barrel or a total of $500,000. In respect to the casualty involving the loss of 10,000 barrels, the primary insurer would pay $1.50 per barrel or $150,000, and the increased value insurer would pay $.50 per barrel or $50,000. In the second example, the primary insurer would pay 10% of $1,500,000, or $150,000, and the increased value insurer would pay 10% of $500,000 or $50,000.

It should be noted that a shortage loss— *i.e.*, a total loss of part of the cargo—would be adjusted by payment of the full insured value of the amount of cargo lost. In the present case the shortage losses are adjusted for the full insured value of the cargo— $30.55 per barrel, $28.27 for Brazilian underwriters and $2.28 for London underwriters.

Parker and Blackwell testified that a method exists for establishing the extent of a loss in the event of contamination. That is called the particular average method of adjustment. This method is designed to provide a recovery based upon the amount of physical damage or physical deterioration to the cargo. The usual method of doing this is to ascertain the sound market value ("SMV") as of a certain location and time, and subtract from it the damaged value ("DV") as of that place and time. This gives a monetary figure for the deterioration. This figure is divided by the SMV to arrive at the percentage of deterioration ("P"). This calculation is represented by the following equation:

$$P = \frac{SMV-DV}{SMV}$$

This percentage is applied to the insured value to determine the amount of the recovery on the particular policy.

As already noted, Armada concedes that the particular average method of adjustment is applicable to the Brazilian insurance. It is only with respect to the London insurance that there is a claim that this method does not apply.

Armada called an expert witness, Thomas L. Riley, an employee of Johnson & Higgins in Houston. As it turned out, Riley did not disagree with the basic explanation of Parker and Blackwell about the meaning of increased value and the normal application of the particular average method of adjustment. The effect of Riley's testimony was to urge that the particular average method should not be applied in the present case because the cargo should be considered to be a constructive total loss. This point will be dealt with later in the opinion.

E. *The November 30, 1982 Meeting*

Armada contends that, even if the increased value provision of the cover note would normally be interpreted to provide for insurance against physical loss or damage rather than against the loss of profits on a contract, nevertheless the parties specifically agreed to the latter coverage in the present case. Armada alleges that such an agreement was entered into at a meeting held in Houston on November 30, 1982 between a representative of Armada and a representative of Johnson & Higgins.

**1058**

Armada contends that Johnson & Higgins agreed that the London insurance would cover lost profits on the Sun contract, and that Johnson & Higgins had either actual or apparent authority to make this agreement on behalf of the London underwriters.

Armada contends that, in addition to its bearing on the increased value provision, the November 30 meeting started a chain of events which resulted in the alleged waiver on the part of the underwriters regarding contingency coverage.

### 1. *Johnson & Higgins' Authority*

In connection with the original London insurance obtained in 1981, and the cover note obtained in July 1982, Johnson & Higgins was concededly the agent of Armada not of the London underwriters. The cover note expressly described Johnson & Higgins as "Brokers for the Assured."

The London underwriters consisted of both Lloyd's underwriters and certain companies who were members of the Institute of London Underwriters. The Lloyd's underwriters bore 42.5% of the risk and the companies bore the rest. Considerable evidence was introduced at the trial on the question of whether the relationships of Johnson & Higgins, Willis Faber and the Lloyd's underwriters was such as to permit a finding that Johnson & Higgins had the actual or apparent authority to bind these underwriters. No such evidence was introduced about the company underwriters. It is appropriate to describe the evidence relating Lloyd's.

There are well-defined practices at Lloyd's about the placement of insurance. There are individual underwriters, and there are also underwriting syndicates in which several parties invest. Someone is designated to accept or decline risks offered to a syndicate. That person is called an "underwriter."

The role of a broker in the placement of insurance varies depending upon the circumstances. There are times when certain underwriters give "binding authority" to a broker to write specific kinds of insurance. This authority is strictly limited to the particular underwriters and types of insurance.

In the absence of such authority, the risks are accepted by the underwriters themselves (either individuals or representatives of syndicates). In this situation the broker represents the insured. He presents a "slip" to the underwriters describing the risk, and a subscribing underwriter will sign the slip and state the percentage of the risk he is willing to take.

The July 15, 1982 cover note was signed by the underwriters themselves. Neither Willis Faber nor Johnson & Higgins had binding authority to enter into this insurance on behalf of the Lloyd's underwriters, much less the company underwriters. During the time involved in this case, Willis Faber had an agreement with certain Lloyd's underwriters that it could bind them on certain kinds of insurance business emanating from Johnson & Higgins. However, ocean marine insurance was specifically excluded from the authority granted to Willis Faber, and none of the underwriters involved in the present case was a signatory to the Willis Faber authority.

Aside from whatever role the broker plays in the placement of insurance, he is usually involved at other points in the insurance process. He may well participate in the handling of a claim. It was certainly true in the present case that Johnson & Higgins performed certain services in the processing of Armada's claims regarding the AGIOS NIKOLAS. In this connection, Johnson & Higgins was acting for the benefit of Armada, except in one particular respect. This related to the handling of the premium. In accordance with custom, Johnson & Higgins calculated the amount of the premium due from Armada and billed Armada. Armada paid Johnson & Higgins. Either Johnson & Higgins or Willis Faber then held the premium for a time for the benefit of the underwriters and then remitted the premium to the underwriters. In this discrete respect, Johnson & Higgins, along with Willis Faber, was performing a service for the London underwriters and acting for them.

Viewing the evidence as a whole, it is clear beyond question that at the time of the November 30, 1982 meeting, Johnson & Higgins had no actual authority to bind the London underwriters to any terms of insurance coverage. Moreover, nothing has been shown to give substance to the theory of apparent authority. The cover note specified that Johnson & Higgins was Armada's broker. There is no evidence that the Lloyd's underwriters or the British company underwriters, or any of them, represented or indicated in any way to Armada that Johnson & Higgins had power to bind them. Anderson did not say anything to this effect on November 30. The mere fact that Johnson & Higgins accepted and held premiums on behalf of underwriters would not amount to an indication that Johnson & Higgins had authority to bind underwriters to insurance coverage.

Furthermore, the fact that Willis Faber could bind certain London underwriters to cover a limited number of specific risks for business emanating from Johnson & Higgins did not invest Johnson & Higgins with apparent authority to bind London underwriters to coverage in all situations. Armada did not learn about the existence of this relationship until after the commencement of trial. It is thus impossible for Brown to have relied upon this fact when she visited Johnson & Higgins' offices on November 30, 1982.

## 2. *Events At Meeting*

As to the November 30, 1982 meeting, Carolyn Brown of Armada testified at the trial, and the deposition of James Anderson of Johnson & Higgins was read into evidence.

Brown was an employee of Armada with responsibility for administering various details regarding oil shipments. She testified that she and others at Armada had certain questions about the London insurance. Specifically, Armada was concerned with the protection of the Sun contract's profits, and also had concerns over collecting under the Brazilian policy. Brown went to Johnson & Higgins on November 30 to discuss these points.

The person at Johnson & Higgins who had handled the placement of the London insurance was on vacation. Brown met with other persons at the firm. Brown first talked with Doug Richmond, who could not answer her questions. She then talked with Anderson, a cargo claims adjuster. It is the meeting of Brown with Anderson that Armada relies on.

Brown stated that of "utmost importance" to her was instilling Anderson with the knowledge that she wanted to protect the profit on that voyage. However, there is no testimony by Brown that she did in fact request, or even discuss with Anderson, insurance against loss of the Sun contract profits.

Brown stated that she told Anderson about the Petrobras and Sun contracts. With respect to the purchase from Petrobras, Brown told Anderson that it was the last in a series of purchases, that it was on C.I.F. terms, and that Armada was uncertain as to the Brazilian coverage. Brown stated that the cargo was going to be particularly profitable to Armada. Brown testified that she gave Anderson "all the details" about the Armada-Sun contract. Aside from the price, Brown did not specify what details she gave Anderson. She did not state what she told Anderson about whether the Sun contract was or was not C.I.F. Under the London cover note, contingency coverage was available only for back-to-back C.I.F. sales.

Brown testified that at the conclusion of the meeting she believed that Anderson had confirmed that Armada had "coverage under the two clauses in the policy, the contingency coverage and the increased value insurance, and when I left that office I had no doubt whatsoever that we were covered under that policy." Brown did not testify that she had any understanding of the distinction between the concept of increasing the *insured value* based on the amount of a contract and the concept of insuring against the loss of a contract as such. She did not indicate in her testimony that there was any discussion of this matter. Brown said nothing which apprised Anderson that Armada wished to have cov-

erage that would depart from the normal marine insurance and would cover possible loss of a contract. Brown did not testify in words or substance that Anderson ever agreed to such a thing.

Anderson's deposition and a letter he wrote to Willis Faber on January 3, 1983 provide a more definitive account of the meeting than does Brown's testimony. He testified:

Carolyn had come in to ask, one, that we name Armada Supply as an additional assured under the policy, specifically named; and two, wanted to discuss a vessel that she had currently which was on the water, the AGIOS NIKOLAS.

She wanted to make a declaration under the increased value and contingency sections of the policy.

It should be noted that Armada was required to make a declaration to Johnson & Higgins with regard to each shipment coming within the terms of the cover note.

Anderson stated that he discussed with Brown the problem of making declarations in view of the fact that Armada's purchase price for the oil was not going to be established until the vessel arrived in New York. The letter of January 3, 1983 recited that Armada usually issued declarations in the form of certificates and sent them to Johnson & Higgins. However, the shipment on the AGIOS NIKOLAS was regarded as a "special situation," and Johnson & Higgins issued the certificates—one for contingency and one for increased value. According to the letter, the intention was to have Johnson & Higgins hold these two certificates until Armada knew its purchase price for the oil, at which time "a more complete and detailed set of certificates could be issued." However, due to the numerous problems which arose upon the vessel's arrival in New York, Johnson & Higgins did not issue the further certificates, and sent the two original certificates to Willis Faber with the letter of January 3.

The two certificates, filled out as a result of the meeting, were signed by Anderson. It is unclear from the evidence if the certificates were filled out in the presence of Brown. The increased value certificate stated:

Shipment is insured under provisions of Increased Value Clause of Cover No. No CS5577 dared July 15, 1982. This certificate to cover increased value of shipment of 348,614.572 barrels as described. above. Increased value amount to be the difference between amount insured under Certificate of Insurance issued by Petrobas Insurer to cover this shipment and sales price of 30.55 per barrel. Exact purchase price is unknown at time of issuance of this certificate.

The contingency certificate stated:

Shipment is insured under provisions of Contingency Clause of cover Note No. CS5577 dated July 15, 1982. Value based on loaded quantity at sales price of 30.55 per barrel.

The contingency certificate does not state what type of sale was made by Armada to Sun.

Aside from the mechanics of declaration, Anderson stated in his deposition that the subject of the coverage was discussed. Anderson testified:

A. We discussed the contingency clause, what it would do from the standpoint that it would respond—it would allow them to issue a certificate for their entire amount and would, in the event the original supplier of certificate did not respond, it would respond as long as all obligations in the original supplier certificate were taken care of.

On the increased value, Carolyn was concerned that it appeared that the—again, she was approximating at this point, that her barrel price on purchase would be roughly somewhere in the neighborhood, I think at that point, of 26 to 25 dollars a barrel and that she wanted to make sure that in the event there as loss or damage to the cargo that her profit was protected.

Q. What did you understand to be meant by her profit?

A. Well, that she would be able to declare that under the increased value clause, the dollar amount that she ex-

pected to realize from the shipment from the standpoint that, if she was selling the cargo at—well, $30 a barrel and was buying it at $25, that you would declare that additional $5 per barrel.

Q. To increase the sum assured?

A. Exactly. And that in the event—a specific analogy we would have had was in the event she had a shortage loss, because obviously that is what we had more of, actually all with Armada, say, of a hundred barrels and the deductible would be fulfilled, say, with fifty barrels—I remember the hundred barrel analogy—that on the other fifty she would collect on the basis of the $30 per barrel price that she declared, the first 25 from the primary and the rest from the other.

Q. Did Ms. Brown tell you anything about the terms of the Armada sale to its customer?

A. I understood her to say that it was a CIF/CIF back-to-back contract.

Thus, according to Anderson, the result of the discussion was the preparation of certificates for the cargo—one for increased value and the other for contingency coverage. With regard to the increased value insurance, it was understood, according to Anderson's testimony, that the difference between the price Armada was to pay Petrobras and the price which Armada was to receive from Sun on the resale would "increase the sum assured."

Focusing on the matter of increased value, Anderson's testimony is totally consistent with the position of the London underwriters in this case, as supported by the expert testimony, to the effect that the increased value coverage related to nothing more than the amount of the insured value for standard marine insurance coverage of loss or damage to property. There is nothing in Anderson's testimony to indicate that he was agreeing to insure against the loss of the Sun contract or the profits on that contract. Certainly Anderson did not agree to something other than the normal particular average method of adjustment in the case of a contamination loss.

Neither Anderson's letter of January 3, 1983 nor the certificates he prepared at the time of the November 30, 1982 meeting indicate any agreement to insure against the loss of the Sun contract profits. The letter stated that "Armada wished to utilize the Increased Value and Contingency provisions of the Armada policy," and then went on to discuss the matter of the certificates. The increased value certificate, as quoted above, defined the increased value amount as the difference between the sale price to Sun of $30.55 per barrel and the amount insured under the Brazilian insurance. The certificate was consistent with the standard concept of a valued policy of marine insurance. It said nothing about insuring against the risk of the loss of the Sun contract.

As to the question of coverage under the contingency clause, Anderson understood Brown to say that both the Petrobras-Armada sale and the Armada-Sun sale were C.I.F. sales. As already stated, this was contrary to the fact. The sale to Sun was on a delivered basis, not C.I.F. Thus, under the terms of the cover note there could be no contingency coverage. However, Armada claims that during the course of later events the London underwriters waived the requirement of the cover note. It is necessary now to turn to these events.

## F. *Further Events Regarding London Coverage*

On December 14, 1982, after having learned of the problem with the AGIOS NIKOLAS cargo, Johnson & Higgins notified Willis Faber by telex that a claim under the London policy would be made. The telex noted that "Armada Houston contacted our office to provide for increased value and contingency coverage on this shipment." It stated that Armada was a C.I.F. purchaser but was silent as to the terms of the sale by Armada to Sun.

On December 16 Willis Faber responded with a telex referring to the London underwriters only as "increased value insurers." In a telex of December 17 to Johnson & Higgins and New York counsel for Armada, Willis Faber stated that

London insurers are only covering increased value and primary insurance was arranged by seller to Armada.

On December 21 Willis Faber telexed Johnson & Higgins that it did

not understand how increased value insurers can be involved in the event original insurers fail to respond. You have already advised us that an increased value certificate was issued and the original cert[ificate] remains.

Willis Faber's comments were understandable. As described earlier, under the terms of the cover note two essential features were involved in contingency coverage. The first is that Armada make a C.I.F. sale to its purchaser. The second is that Armada issue a certificate of insurance to its purchaser, who would be the beneficiary of the insurance. The purchaser, not Armada, would have the right to make a claim under the contingency coverage. However, to recover under the increased value provision, Armada would need to retain title and be the beneficiary of the insurance. Thus, under the terms of the cover note Armada could not recover under both contingency coverage and increased value coverage.

Willis Faber telexed Johnson & Higgins on January 4 stating that London underwriters were "still proceeding with the line of thinking that they were only involved for increased value." However, the telex requested that Johnson & Higgins supply certain documents, and expressed the hope that then Willis Faber "will get a more positive response from insurers."

On January 3 Anderson of Johnson & Higgins had written the letter to Willis Faber describing the meeting of November 30 with Carolyn Brown of Armada. Anderson enclosed the two certificates he made out on November 30, the operative language of which was quoted earlier in this opinion. One of these certificates related to contingency coverage and one related to increased value coverage. Also enclosed was a third certificate dated December 22 signed by Brown. This was, of course, after the problems with the cargo had been discovered in New York, and af-

ter Sun had rejected its contract with Armada. Brown's certificate of December 22 contained the following description:

348,614.572 loaded barrels of No. 6 High Sulpher Fuel Oil purchased CIF New York and sold delivered outturn New York with a bill of lading dated November 16, 1982.

\* \* \* \* \* \*

Purchase price unknown upon loading. Cargo to be covered under Armada's 'increased value' and 'contingency' clauses.

The certificate listed the value of the oil as $10,650,175.17 with the following explanation:

This value based on loaded quantity at sales price: 348,614.572 BBLS @ 30.55/BBL

It is important to note that this is the first time, according to evidence in this case, that Armada had affirmatively stated that the sale to Sun was on a delivered, rather than a C.I.F. basis.

It is clear that by early January London underwriters had not assented to the contingency coverage, and were in effect denying such coverage until and unless Armada could show the basis for it. Since Armada's sale to Sun had not been on a C.I.F. basis and Armada had delivered no certificate of insurance to Sun, there was in fact no basis for contingency coverage.

However, it appears that Johnson & Higgins did not clearly understand the situation and mistakenly billed Armada for a premium for contingency coverage. Willis Faber requested on January 11, 1983 that Johnson & Higgins advise "what the billed premium was for this shipment and how calculated." Willis Faber also asked whether the premium had been paid.

Johnson & Higgins telexed Willis Faber on January 12 with a description of the proposed premium. The total amounted to $5,023.10, the bulk of which was for contingency coverage and was expressly designated as such. There was also a charge for increased value coverage under the separate provision (at the .01% rate). The telex asked that Willis Faber "confirm up agreement to above calculations" and stat-

ed that then Johnson & Higgins would and "press for immediate collection."

On January 14 this premium calculation was circulated to the underwriters and initialled "SFAC Seen." by the leading Lloyd's and company underwriters. "SFAC" is an abbreviation for "So Far As Concerned." The undisputed testimony is that this meant that the London underwriters' position was still reserved with respect to their position on the coverage. Willis Faber made no reply to the Johnson & Higgins telex of January 12.

In spite of the fact that no such reply had been received, Johnson & Higgins proceeded to bill Armada for the premium of $5,023.10. The bill was sent on January 20, and Armada made payment on February 28.

It will be recalled that on January 4 Willis Faber telexed Johnson & Higgins requesting documents regarding the claim for contingency coverage. There is no evidence of a specific communication in response. However, John M. Blackwell of the Lloyd's claims office testified:

Q. Did there come a time when you determined what was, in fact, the involvement of London underwriters in this matter?

A. Well, finally, it is our practice to reserve our position until we get the actual documents which establish the position, i.e., the actual terms of sale between the various parties so we can then see, make a determination.

He stated that prior to receiving the "actual documents," the concerned parties in London were relying on various telexes. The documents which permitted a resolution of the coverage question arrived in February. The documents showed conclusively that Armada had purchased on C.I.F. terms from Petrobras but had not sold on C.I.F. terms to Sun. Therefore, there could be no contingency coverage. There was, however, increased value coverage. On March 4, 1983 Clyde and Co., solicitors for London underwriters, wrote Willis Faber stating that, due to the absence of back-to-back C.I.F. sales, the contingency coverage "does not come into operation." The letter went on to state

You will appreciate that Underwriters are not able to agree the basis of your premium calculations contained in your telex to us of January 14th, and in any event they do not accept that in the present case they are on risk for what you have called 'Contingency Coverage' or that any premium is payable in respect thereof, whatever the final rate adopted.

In the meantime, Willis Faber's accounting department had prepared a "premium closing endorsement" on February 3, 1983 for submission to London underwriters. The information contained on this form did not contain any identification of an amount being collected for contingency coverage. However, it did have the amount of the premium listed as $5,023.10, stating that it was on an "insured value" of "U.S. $10,-650,175.17." On March 15, 1983 representatives of the London underwriters initialled this form. In June 1983 the premium was forwarded to London underwriters by either Johnson & Higgins or Willis Faber. The amount paid for the contingency coverage has not been returned.

## IV

## CONCLUSIONS OF LAW REGARDING LONDON INSURANCE

### A. *Interpretation of Increased Value Provision*

As already described, the London underwriters claim that the insured value provision in the cover note related solely to augmentation of insured value, and that it in no way provided for a departure from the normal concept of marine cargo insurance as covering property loss or damage. They contend that the normal methods of adjustment apply—including particular average adjustment in case of a contamination loss. Armada contends that the increased value coverage insured its loss of profits on the Sun contract.

As an initial proposition, it is clearly possible to have insurance against loss of

profits. 1 M. Mustill & J. Gilman, *Arnould's Law of Marine Insurance and Average* ¶ 318, at 206 (16th ed. 1981); *see Barclay v. Cousins* (1802) 2 East 544. However, Armada concedes that ordinary marine cargo insurance is against loss of cargo, not against loss of profits. *See Royal Exchange Assurance Co. v. McSwiney*, 14 Q.B. 646 (1849). Marine underwriters are not responsible for loss of profits unless there is "a policy specially providing for such an event." *Id.* at 663. Cases involving such express provisions are *Canada Sugar Refining Co. v. Insurance Co. of North America*, 175 U.S. 609, 20 S.Ct. 239, 44 L.Ed. 292 (1900); *Patapsco Insurance Co. v. Coulter*, 28 U.S. (3 Pet.) 222, 7 L.Ed. 659 (1830).

Armada cites *Standard Marine Insurance Co. v. Scottish Metropolitan Assurance Co.*, 283 U.S. 284, 51 S.Ct. 371, 75 L.Ed. 1037 (1931), for the proposition that increased value insurance, such as that provided in the July 1983 cover note, should be construed as insurance against loss of profits. This case involved a purchase of wheat by Dreyfus at a price of $1.38 ½ per bushel C.I.F. Montreal. The wheat was to be shipped from Port Arthur. The seller purchased insurance for Dreyfus' account at a valuation of $1.42 per bushel. Contemporaneously Dreyfus also obtained an insurance policy providing that it was

> To cover "Increased Value" on grain owned by the Assured or in which the Assured may have an interest, ...

*Id.* at 285 n. 1, 51 S.Ct. at 371 n. 1. The policy did not specifically refer to profits, as did the policies in *Canada Sugar* and *Patapsco, supra,* cited by the Court in the *Standard Marine* decision. The policy in *Standard Marine* defined increased value to be the difference between Dreyfus' C.I.F. cost and the highest market value per bushel between the day of sailing and the day on which the cargo would have arrived at the destination but for the loss, plus $0.05. The vessel carrying the wheat collided with another vessel, and the cargo was lost. The primary insurer paid Dreyfus $1.42 per bushel or $284,000. The increased value insurer paid $62,500, which was the difference between the increased

market value during the voyage ($1.69 ¾) and the C.I.F. price ($1.38 ½), or $.31 ¼, plus $.05.

The owner of one of the vessels brought a limitation of liability proceeding. Both vessels were held to be at fault. The amount held to be due Dreyfus for maritime tort was $309,500. This was the value of the grain at the time of shipment ($1.54 ¾ per bushel). Both insurers intervened in the limitation proceeding claiming to be subrogated to Dreyfus' right of recovery.

The increased value insurer argued that it was a coinsurer with the primary insurer and that it was entitled to share in the $309,500 on a pro rata basis. Under this theory, the primary insurer would receive a share of over 20%, or more than $60,000. The district court rejected this position and ordered payment to the primary insurer of $284,000, the full amount of its insurance liability. This was equal to $1.42 per bushel. The balance of the $309,500 less court costs was paid to the increased value insurer. Thus, the increased value insurer obtained something less than $25,000. The court of appeals affirmed.

The increased value insurer was the petitioner before the Supreme Court and the primary insurer was the respondent. The issue, as described by the Court, was

> ... whether petitioner and respondent were co-insurers against the same risk, or independent insurers against different risks.

*Id.* at 287, 51 S.Ct. at 372. As co-insurers they would share pro rata. As independent insurers they would not. The Court went on to state:

> We think it clear, and it seems to be conceded, that since respondent is an insurer against loss of cargo, petitioner, if its policy be regarded as insuring against loss of profits of the venture, is not a co-insurer with respondent, even though the liability of both accrued by reason of the destruction of the cargo by the same peril. The very purpose of insurance of profits is to protect the insured against

risk of loss which is not covered by insurance upon the cargo itself.

*Id.* (citations omitted). The Court then discussed the nature of the recovery made by Dreyfus against the wrongdoer, as to which rights of subrogation were asserted. Under principles of maritime law, this was a recovery for loss of cargo and not for loss of profits. An insurer against cargo loss could properly be subrogated, but an insurer against loss of profits could not. The Court stated:

> When the insured thus separates and separately insures two distinct elements of risk—value of cargo and profits which may be earned on it—both insurers cannot share by subrogation in his right to recover against wrongdoers for cargo damage alone.

*Id.* at 287, 51 S.Ct. at 372.

The Court then ruled on the question of whether the increased value insurance was in fact insurance against loss of cargo or against loss of profits. The petitioner argued that its insurance was not in fact against loss of anticipated profits, but only related to the increased value of the property, not differing from any other insurance on property. *Id.* at 288, 51 S.Ct. at 372. The Court rejected this argument, stating:

> But this argument leaves out of account the peculiar nature of insurance on increased value of cargo over its value at the port of departure, which, for present purposes, is to be distinguished from insurance on hull or any other property, increase in value of which may be embraced in, and recovered under policies insuring against a loss of the property.

*Id.* at 288, 51 S.Ct. at 372.

However, the Court was careful to limit this ruling to the specific case before the Court, and expressly left open the question as to "whether that coverage [increased value] may for all purposes be correctly described as insurance of profits." *Id.* at 289, 51 S.Ct. at 373.

The Court emphasized that the problem before it related to the division of a fund of $309,500, which was based on the value of the wheat at the time and place of shipment ($1.54 ¾). The Court stated that if the increased value insurance had operated to increase the total insured value from the primary value of $1.38 ½ to the amount of the tort recovery ($1.54 ¾), involving a difference of $.12 ¾ per bushel, there could have been a pro rata distribution of the fund. But here, the increased value insurance brought the total amount of the insurance up to $1.69 ¾ plus $.05, or to a total dollar value of $346,500. The Court concluded that since the increased value insurance brought the total insurance payments to a figure substantially higher than the amount of the tort recovery, the increased value insurer was not entitled to a pro rata share of that recovery.

The *Standard Marine* case has been discussed at great length because it is the only judicial decision bearing on the question in the present case—whether increased value insurance is insurance against loss of cargo or against loss of profits. Since it is a Supreme Court decision, it is crucial to determine the exact meaning of that decision.

In this connection, we start with the fact that *Standard Marine* emphasizes the distinction between insurance against cargo loss and insurance against loss of profits. This is a distinction which the London underwriters urge as essential to an understanding of the structure of marine insurance. On the question of what kind of insurance an increased value policy provides, *Standard Marine* appears at first blush to strongly support the position of Armada, that it is insurance against loss of profits. However, upon a careful analysis, it becomes clear that the case by no means stands for the proposition that increased value insurance is always, and for all purposes, insurance against loss of profits. Indeed, it becomes clear that *Standard Marine* does not control the present case.

The problem dealt with in *Standard Marine* differs in essential respects from that presented in the present case. The most important difference relates to the terms of the insurance. In *Standard Marine*, although the insurance did not literally refer to profits, the measure of the increased

value could in fact be construed as being profit. The increased value was defined as the difference between Dreyfus' C.I.F. invoice cost and the higher market value reached during the voyage. By contrast, in the present case, not only is there no literal reference to profits, but the definition of increased value does not amount to profit in any sense. Armada's profit on the Sun contract was the difference between the price paid to Petrobras and the price to be received from Sun. As already described, this was equal to $4.85 per barrel or a total of about $1.6 million. This was not the measure of the increased value as defined in the July 1982 cover note. Under the cover note, the starting point for the calculation of the increased value was the *sum insured* by Petrobras not the price paid to Petrobras. The sum insured was the price plus 10%, that 10% being equal in this case to over $800,000. The increased value was $794,842 or $2.28 per barrel, substantially less than the profit.

Another crucial factor is that the increased value provision in the July 1982 cover note was "on concurrent conditions" with the primary insurance, a proviso not contained in the increased value policy in *Standard Marine*. The primary Brazilian insurance was concededly against loss or damage to cargo and not against loss of profits. Moreover, the July 1982 cover note itself stated plainly the nature of the interest being insured. It contained the following description:

INTEREST: CRUDE OIL IN BULK.

In addition, the increased value provision in our case must be viewed in the context of the cover note as a whole. As described earlier, the cover note first provided that Armada could obtain regular marine cargo insurance, presumably on F.O.B. purchases. In this connection, there was a definition of the "BASIS OF VALUATION" as cost, insurance and freight plus 10%, or alternative formulas which need not be described here. It is clear that the regular marine insurance was against loss or damage to cargo and that the valuation provision did not turn it into insurance against loss of profits. As described earlier, another optional form of insurance in the cover

note was contingency coverage. In the event Armada made a C.I.F. sale, it could give its purchaser a certificate for the "full value." The standard marine rate was to be paid on the "increased value," if any, over and above Armada's cost. It is quite clear that the contingency insurance, including the reference to increased value, was another device for providing insurance against loss or damage to cargo, and was not a departure into a new type of insurance—*i.e.*, against loss of profits.

When we come to the separate increased value provision itself, again there is no basis for construing it as anything other than insurance against loss of cargo. In the context of the cover note as a whole, it can only be construed as providing for the augmentation of the insured value of the cargo to be used in calculating the amount of recovery in the event that the insured risk—*i.e.*, cargo loss or damage—occurs.

The Court does not consider the increased value provision in the July 1982 cover note ambiguous or subject to different reasonable interpretations. Thus, the rules of construction applicable in such situations are not apposite. *See Vargas v. Insurance Co. of North America*, 651 F.2d 838 (2d Cir.1981); *Glover v. National Insurance Underwriters*, 545 S.W.2d 755 (Tex.1977). This does not mean that a person unfamiliar with marine insurance might not need to study the cover note carefully to determine its true meaning. However, when the matter is given reasonable analysis, the meaning is clear.

The court holds that the increased value coverage of the July 1982 cover note was insurance against the risk of cargo loss or damage, not against the risk of loss of profits on a contract. It follows that, as to the contamination loss phase of the case, the particular average method of adjustment applies.

B. *November 30, 1982 Meeting*

The significance of the November 30 meeting involves mainly issues of fact, as the earlier discussion shows. The court has found as a fact that Johnson & Higgins

did not purport to make any agreement to insure the Sun contract or the profits on that contract. As to the question of whether Johnson & Higgins had the actual or apparent authority to bind the London underwriters to such an agreement, this issue involves questions of fact based upon general, well-recognized agency principles. *See Guthrie v. Republic National Life Insurance Co.*, 682 S.W.2d 634 (Tex.App. 1984); *Tidelands Life Insurance Co. v. Harris*, 675 S.W.2d 224 (Tex.App.1984); *Bellefonte Underwriters Insurance Co. v. Brown*, 663 S.W.2d 562, 585 (Tex.App. 1983), *aff'd in relevant part*, 704 S.W.2d 742 (Tex.1986). The court has found that there was no such actual or apparent authority.

It should be noted that at one point Armada appeared to rely upon a Texas statute, Tex.Ins.Code Ann. § 21.02 (Vernon supp. 1986). This provides that a party who performs certain functions of an insurance broker "shall be held to be the agent of the company ... as far as relates to all the liabilities, duties, requirements and penalties set forth in this chapter." However, Armada's claim regarding increased value coverage does not relate to "this chapter." Armada now concedes this.

The court concludes that, as a matter of fact and law, no agreement was made at the November 30 meeting binding the London underwriters to insurance against loss of the Sun contract or the profits thereon.

### C. *Contingency Coverage*

The cover note required Armada to make a C.I.F. sale to its purchaser, and to give a certificate of insurance to that purchaser, in order for there to be contingency coverage. Armada did neither.

However, Armada argues that the risk to the underwriters did not change as a consequence of the type of sale to Sun and that the requirement that the cargo be sold C.I.F. was not a material term of the cover note.

The London underwriters introduced evidence that the type of insurance Armada is seeking can be purchased and is called a guarantee of collectibility. Such a policy would insure Armada against the risk that the primary insurer would be unable to pay. However, the fact remains that Armada did not purchase such insurance, but obtained coverage that allowed it to pass on a certificate of insurance to a C.I.F. buyer.

The requirement of a C.I.F. sale and of providing an insurance certificate to the buyer was part of the essential structure of the contingency coverage in the cover note. It was a material term and cannot be disregarded.

We now deal with the claim that the underwriters waived the requirement of the cover note because they received and retained the "contingency" premium.

There is no justification for allowing the circumstances regarding the payment of the premium to operate to rewrite the insurance coverage.

Waiver and estoppel may operate to avoid a forfeiture of a policy, but they have consistently been denied operative force to change, rewrite and enlarge risks covered by a policy. In other words, waiver and estoppel can not create a new and different contract with respect to risks covered by the policy. *Travelers Indemnity Co. v. Holman*, 330 F.2d 142, 144 n. 1 (5th Cir.1964); (quoting *Great American Insurance Co. v. Mitchell*, 335 S.W.2d 707 (Tex.App.1960)); *see also Northern Assurance Co. v. Stan-Ann Oil Co., Inc.*, 603 S.W.2d 218, 223 (Tex. App.1979).

In any event, the evidence does not support the conclusion that the London underwriters waived their objections to coverage through retention of a premium. Waiver is the voluntary relinquishment of a known right. *Pacific Indemnity Co. v. Acel Delivery Service, Inc.*, 485 F.2d 1169, 1173 (5th Cir.1973) (Texas law).

The evidence shows that there was a considerable period of time during which the London underwriters reserved decision on the contingency coverage. Johnson & Higgins billed Armada for the contingency coverage premium before the question of coverage was resolved. However, under-

writers did not waive their position, and, when the facts were fully known, underwriters plainly denied coverage in the letter of March 4, 1983 from Clyde & Co., solicitors for underwriters, to Willis Faber, the London correspondent for Johnson & Higgins. The subsequent receipt by London underwriters of a total premium, which included the contingency premium, was an obvious mistake. It does not overcome the force of London underwriters' express denial of coverage.

## V

## PROBLEMS UNDER BRAZILIAN INSURANCE

There are a number of problems about coverage and quantum of recovery under the Brazilian insurance. These matters affect, of course, the Brazilian underwriters. They also affect the London underwriters because the London increased value insurance was on "concurrent conditions" with the underlying Brazilian insurance.

### A. Commencement of Coverage

Armada claims that the transit covered by the Brazilian underwriters commenced in the pipeline before the oil was actually loaded on the AGIOS NIKOLAS, and that 8,000 barrels of oil were lost in this pipeline transit.

The tanks from which the oil was loaded at Rio de Janeiro were located on the mainland at the refinery, as well as on the Island D'Agua, located in the harbor area. The vessel was tied up at the island. Oil for the AGIOS NIKOLAS came from three tanks on the mainland and two on the island. There was a pipeline arrangement to carry oil from the various tanks to the ship, including a 14 kilometer pipeline from the mainland to the island. Oil from the mainland tanks did not pass into or through the island tanks. Oil from all tanks went into the pipeline system and then directly to the ship.

A survey showed that 348,614.572 barrels of oil were taken from the various tanks. However, the ullage report taken on board the AGIOS NIKOLAS showed that only 340,520 were delivered to the ships. Thus, 8,094.572 barrels of oil disappeared in the pipeline system.

Armada claims that the loss in the pipeline system is covered by the Brazilian insurance. The Brazilian underwriters contend that coverage commenced when the oil arrived at the flange of the vessel.

The insurance certificate issued to Armada as part of its C.I.F. documentation stated that coverage existed "from warehouse to warehouse against all risks of loss or damage, subject to the conditions of the Institute Cargo Clauses ('All Risks')." The Institute Cargo Clauses stated that

> This insurance attaches from the time the goods leave the warehouse or place of storage at the place named in the policy for the commencement of the transit, continues during the ordinary course of transit....

The Brazilian policy itself, on which the certificate was based, contained a more detailed definition of the commencement of coverage.

COMMENCEMENT AND TERMINATION OF THE RISKS:

> The insurance shall be in effect as from the time of the commencement of the first operations for the loading and shall only terminate upon the delivery thereof safely in the shore tanks or warehouses of the Insured, the buyers, endorsees or consignees of the products. It therefore covers not only the maritime transportation but also any possible initial and/or supplementary distances on any means of transportation including transfers via pipeline, whether on National Territory or abroad, and possible intermediate storage.

The various instruments are consistent and make it clear that coverage commenced upon the transfer of oil from the tanks into the pipeline system. The policy stated that coverage attached "as from the time of commencement of the first operations for the loading," and that the insurance covered "not only the maritime transportation, but also any possible initial ... distances on any means of transportation including transfers via pipeline."

Brazilian underwriters argue that, as a matter of law, Armada cannot be covered until the oil left the premises of the shipper. They rely upon *Plata American Trading, Inc. v. Lancashire*, 29 Misc.2d 246, 214 N.Y.S.2d 43 (Sup.Ct.1957). The case is not on point. There the plaintiffs had taken out a policy of insurance for a shipment of tallow. The insurance covered "warehouse to warehouse," specifically "from the time the goods leave the warehouse at the place named in the policy for the commencement of the transit." The tallow had been removed from one set of tanks at the loading area and had been moved to another tank. In the process of this transfer, a portion of the tallow was lost. The trial court found that the loss of the tallow was not covered because it was not yet "in transit." 214 N.Y.S.2d 46–47. The court, however, indicated that had the goods been *en route* to the ship and, thus, had "reached the point of no return," the loss would have been covered under the policy. *Id.* at 46.

*Plata* does not apply to the present case, where the oil was not moving between the shipper's tanks but from those tanks to the vessel.

B. *Termination of Coverage*

As already stated, the AGIOS NIKOLAS arrived in New York harbor on December 9, 1982. Some of the cargo needed to be unloaded onto a barge before the vessel could put into a terminal. About 49,000 barrels were transferred to a Sun barge. At that point a survey indicated that some of the AGIOS NIKOLAS cargo was contaminated with seawater. The indications were that some of the cargo had been used as fuel oil and seawater had been introduced as a "replacement."

On December 16 the vessel was instructed to come into the Belcher Terminal to unload the rest of the cargo. On the same date Armada filed suit in the United States District Court for the District of New Jersey and obtained a warrant for the arrest of the vessel.

The vessel did not proceed to the Belcher Terminal and the arrest warrant was not executed.

On the morning of December 18, 1982, the master of the AGIOS NIKOLAS represented to United States Custom officials in New York, who were holding the vessel's Certificate of Registry, that the vessel would conduct sea trials. After receiving back the Certificate, the ship departed from New York harbor. That same day, the vessel operator, Emmanuel A. Karavais, sent Armada a telex demanding that Armada guarantee the AGIOS NIKOLAS immunity from arrest prior to any re-entry of the vessel to the port of New York and that Armada pay for the freight and demurrage by December 20, 1982. Karavais told Armada that if these demands were not met the vessel would be instructed to sail away and sell Armada's cargo elsewhere to satisfy the alleged claim for freight and demurrage.

Armada contacted Petrobras. On advice of counsel and with approval of the London underwriters, Armada paid to the vessel owners approximately $556,000 by depositing the funds into a Bermuda bank account. Armada incurred legal fees of approximately $90,000 in connection with the return of the vessel.

The AGIOS NIKOLAS returned to New York harbor on January 13, 1983. New qualitative and quantitative analyses were conducted on January 17, 1982. These reports showed that there was substantially less cargo on board than before the ship's departure from New York harbor and that a significant increase in the contamination had occurred. Only 284,865 barrels were ultimately unloaded, an amount which included a certain amount of seawater.

The Brazilian underwriters argue that their coverage terminated when the AGIOS NIKOLAS departed from New York harbor on December 18, 1982. They contend that when the ship left, this constituted a new voyage. They ask that their liability be limited to the shortage and contamination that occurred prior to the vessel's flight from New York.

Armada's certificate of insurance defined the scope of coverage, as earlier noted, as "From warehouse to warehouse against all risks or loss or damage, subject to the conditions of the Institute Cargo Clauses ('All Risks')." The relevant language of the Institute Cargo Clauses was as follows:

> [t]his insurance shall remain in force ... during the delay beyond the control of the Assured, any deviation, forced discharge, reshipment or transhipment and during any variation of the adventure arising from the exercise of a liberty granted to shipowners or charterers under the contract of affreightment.

The policy stated that the risk "shall only terminate upon delivery ... safely in the shore tanks or warehouses of the Insured, the buyers, endorsees or consignees of the products." It further stated:

> The coverage of this Policy is extended to cargoes of petroleum in bulk intended to be stored in tanks abroad for subsequent resale in lots for a period of not more than 30 days as from delivery of the merchandise into such tanks....

The Brazilian underwriters concede that if the flight of the AGIOS NIKOLAS from New York harbor was a "deviation" under the provisions of the Institute Cargo Clauses, then losses during such flight were covered. Brazilian underwriters' own expert testified on cross-examination that the incident was a deviation.

Q. We had a situation here where the vessel arrived in New York and for reasons which are known only to perhaps the master or the owner, whoever gave the orders, the vessel departed after having discharged a small portion of its cargo into a barge. I think you testified that in your opinion the voyage terminated at the point?

A. That's right.

Q. First of all, what is a deviation?

A. A departure from the ordinary course of transit.

Q. Would you characterize this as a deviation?

A. I would think so. The vessel did arrive in ordinary course of transit, from thereafter she disappeared.

This is consistent with the statement of the Second Circuit in *Sedco, Inc. v. S.S. Strathewe*, 800 F.2d 27, 30 n. 1 (2d Cir.1986).

█ The coverage of the Brazilian insurance ended only after the vessel had returned from its flight out of New York harbor. Losses occurring during this incident are covered.

### C. *Constructive Total Loss Theory*

█ Armada argues that when the AGIOS NIKOLAS departed from New York harbor to avoid process the cargo became a constructive total loss. Armada relies on the fact that, for a time, it did not know what had happened to the cargo. The vessel left surreptitiously on December 18, 1982. But later that day, the vessel operator established contact with Armada through telex. Armada later recovered the cargo. The court holds that there is no basis for the constructive total loss theory.

### D. *Quantum of Losses*

The losses that Armada suffered can be broken down into three groups: contamination loss, shortage loss, and "sue and labor" expenses incurred in reconditioning the contaminated oil.

#### 1. *Contamination loss.*

Under the Petrobras-Armada contract the oil was to have a "bottom sediment and water" content (BS & W) of a maximum of 1.0%. The same specification was contained in the Armada-Sun contract. Petrobras apparently complied with this requirement. However, contamination occurred on the voyage from Brazil to New York.

The survey which revealed the contamination was completed during the off-loading process, after 49,175 barrels had been loaded onto a Sun barge. It appears that not all of the vessel's tanks were contaminated. However, the composite BS & W of the oil was 1.6%. The BS & W of the oil loaded onto the Sun barge was 1.2%. Both figures were above the 1.0% maximum in the Sun contract, and above the BS & W as

it was when the oil was loaded in Brazil. On December 14 Sun notified Armada that it would not accept the cargo at the contract price of $30.55 per barrel.

The price of sound oil on the New York market was $25.70 at this time. Presumably this was the value of the uncontaminated portion of the AGIOS NIKOLAS cargo. The contaminated portion was worth less.

In any event, on December 16 Sun agreed to a new price for the whole cargo of $27.40 per barrel. Sun paid this price for the 49,175 barrels loaded onto the barge. However, on December 20 Sun rejected the remainder of the cargo, after the AGIOS NIKOLAS left New York harbor.

When the vessel returned to New York it was discovered that all the tanks in the vessel were contaminated—more of the cargo had been used for fuel and additional seawater had been injected into the cargo.

The Institute Cargo Clauses, which were a part of the Brazilian insurance, contained the following provision:

9. It is the duty of the Assured and their Agents, in all cases, to take such measures as may be reasonable for the purpose of averting or minimizing a loss and to ensure that all rights against carriers, bailees or other third parties are properly preserved and exercised.

This is referred to as the "sue and labor" provision. Pursuant to this provision Armada undertook efforts to recondition the damaged cargo.

Armada made arrangements to offload the vessel and recondition the cargo at the Bayonne Terminal Warehouse in Bayonne, New Jersey. This was the only terminal in the area where space could be obtained.

The Bayonne terminal could not accommodate the vessel itself. To deliver the oil from the ship to the Bayonne terminal tanks, it was necessary to heat the cargo and then discharge the oil into barges. The total costs for barging and demurrage were $111,783.76.

. Armada incurred two taxes. Armada paid $22,675.69 for a customs bond and

duty and $2,865.27 for the New York Spill Tax.

At the terminal the oil was stored in tanks numbered 5073, 5516 and 6010.

The standard method for removing water from oil is to heat and circulate it. Through this process, the water is separated from the oil. However, the process would have taken, for the quantity involved here, between three and six months. Armada enlisted the aid of Exxon Chemical in Baytown to help accelerate the process. On Exxon's advice, Armada purchased demulcifiers and added them to the oil to speed up the separation process. ·

Various expenses were incurred in Armada's efforts to recondition the oil. These were the cost of the reconditioning chemicals, $111,739.50, the cost of transporting the chemicals, $9,499.42, and the cost of steaming and storing the contaminated oil, $440,904.50.

Seven separate sales of the oil were made. The first sale, as already discussed, was to Sun on December 11, 1982, before the ship departed from New York. The second was made to Vanol on January 25, 1983. The third was to Montello on February 2, 1983. The fourth was to Vanol on March 4. The fifth was to Belcher Oil on March 8. The sixth was to Scanoil on March 11. The seventh was to Apex on March 16.

*The First Vanol Sale* ·

On January 25, 1983 Armada contracted to supply between 100,000 and 110,000 barrels of oil to Vanol,, to be delivered at the buyer's terminal in Philadelphia in early February. The maximum BS & W specified in the contract was 1.0%. The price per barrel for the oil was to be $25.50.

A survey at the time of delivery showed that the BS & W for the cargo varied between 2.0% and 2.8%. In response to the excessive BS & W content, Vanol reduced its price to $24.47 per barrel for the oil, and Armada necessarily accepted this reduction. The total sales price was $2,472,638.44. The cost of delivery to Vanol, borne by Armada, was $90,054.79. When the cost of delivery is deducted from the

sale price, the net amount received per barrel was $23.58. The spot price for sound oil (maximum 1.0% BS & W) at the time of the sale was $26.00 per barrel.

*The Montello Sale*

Montello Oil Corp., was the third purchaser of a part of the AGIOS NIKOLAS cargo. On February 2, 1983 Montello agreed to purchase 100,000 barrels of oil with a 1.0% BS & W for $25.35 per barrel. Under the agreement, Montello would take delivery of the oil at the Bayonne terminal in New Jersey.

Following delivery in mid-February, a dispute arose over the quality of the oil. Montello refused to pay the entire purchase price and there was litigation. Ultimately a settlement was reached. The total received from Montello was $1,137,152.68 (including $285,000 in the litigation settlement) for 49,110.26 barrels, which averages $23.16 per barrel. The spot price for sound oil at the time of the sale was $26.00 per barrel.

Armada incurred expenses totalling $227,432 in pursuing the litigation.

*The Last Four Sales*

In March 1983 the remaining cargo was sold to four purchasers: Vanol, Belcher, Scanoil and Apex. These sales are the subject of sharp dispute. Defendants allege that Armada negligently made these sales for less than the value of the oil.

On March 4, 1983 Armada agreed to sell between 35,000 and 40,000 barrels of the oil to Vanol for $23.25 per barrel. There was to be maximum BS & W of 4.5%. A quantity of 34,377.49 barrels was delivered at Bayonne on March 9. A survey of that date showed that the BS & W was only 1.2%, far below the 4.5% maximum specified in the agreement. The spot price for sound oil at the time of this sale was $25.38 per barrel.

On March 8, before the survey of this Vanol oil, Armada agreed to a sale to Belcher for $23.00 per barrel. The agreement provided for a maximum BS & W of 3.0%. On March 9 and 10 Belcher took delivery of 23,748.76 barrels. In a survey taken at that time it was revealed that the

composite BS & W was only 1.2%. The spot price for sound oil at the time of this sale was $25.13 per barrel.

On March 11 Armada agreed to sell between 35,000 and 45,000 barrels for $23.90 per barrel to Scanoil. There was to be a maximum BS & W of 1.5%. On March 13 Scanoil took delivery of 43,660.14 barrels in Bayonne. A survey showed that the BS & W was only 0.7%. The spot price for sound oil at the time of this sale was $25.13 per barrel.

Armada made its last sale from the cargo to Apex Oil. The agreement was entered into on March 16, and was for a sale of approximately 30,000 barrels at $23.95 per barrel. There was to be a maximum BS & W of 1.5%. In connection with this sale, oil was transferred from Bayonne tank 6010 to tank 5076 at the same facility. It is not clear when title passed to Apex. A sample taken from tank 6010, prior to the transfer, showed that the oil was sound, having a 0.8% BS & W content. However, the oil, after its arrival in tank 5076, was found to have 3.4% BS & W. Apex reduced the price to $23.23 and Armada agreed to the reduction. The price for sound oil at the time of this sale was $25.13 per barrel.

■ This discrepancy between the condition of tank 6010 and that of tank 5076 presents a difficult factual problem. However, the court finds that the oil in tank 6010 had been purified to a 0.8% BS & W, and that the oil became contaminated to the degree of the 3.4% BS & W in tank 5076. This contamination was not a risk insured by defendant marine underwriters.

All of the AGIOS NIKOLAS cargo was not sold. Resting at the bottom of tank 6010 was some amount of oil, probably no more than 6,000 barrels. Although a test of tank 6010 revealed that the bottom sample at two feet had a BS & W content of 0.8%, the surveyor's report indicated that a "Dead Bottom Sample" contained 24% water and sediment. Exactly where this dead bottom sample was taken from, and the quantity of oil involved in the 24% contamination, was left unproven at trial.

Defendants concede that Armada has adequately proved the monetary value of the contamination loss on the quantities of oil sold to Sun, to Vanol on the first occasion, and to Montello. However, as stated, defendants deny that there has been such proof as to the oil sold to Belcher, to Vanol on the second occasion, to Scanoil and to Apex. The court agrees with defendants for the following reasons.

Earlier in this opinion there was a description of the particular average method of adjustment. This adjustment involves ascertaining the monetary value of the deterioration by taking the difference between sound market value (SMV) and damaged value (DV). This difference is divided by the SMV to obtain the percentage of deterioration. The equation is:

$$P = \frac{SMV-DV}{SMV}$$

Where a cargo is contaminated and the insured attempts to have it reconditioned, for the purpose of particular average adjustment the value of the oil must be ascertained after the reconditioning. The damaged value (if some contamination remains) is the value taking into account this contamination. Of course, if the reconditioning has eliminated the contamination and made the oil sound, there can be no recovery for contamination loss as such. We are not here speaking of the costs of reconditioning, which may be recovered separately as a sue and labor expense.

In the present case there is no evidence, by survey, expert testimony or otherwise, which shows the value for the reconditioned oil on an overall basis. Armada has attempted to prove the value of the reconditioned oil solely by means of the sale prices of that oil to Vanol *et al.*

▮ It is obvious that if there is a failure of proof as to damaged value, an essential component of the particular average adjustment is missing, and the insured cannot recover.

▮ The second Vanol sale and the Belcher sale involved quantities of oil with a small degree of remaining contamination (1.2% BS & W in each case). However, the prices paid by Vanol and Belcher ($23.25 and $23.00 respectively) were based on specifications (4.5% and 3.0% BS & W) which sharply differed from the actual condition of the oil. In determining whether the underwriters are liable for contamination loss, there is no basis for considering anything other than the actual condition of the oil. There is no evidence in the record of the actual damaged value of the oil involved in the second sale to Vanol and the oil sold to Belcher. Thus, as to these sales, there is a failure of proof as to damaged value.

In the case of the oil sold to Scanoil, the oil was actually sound, although the price was based on a specification allowing for contamination. There can be no recovery for contamination loss as to this quantity of oil.

With regard to the Apex sale, it is obvious that the final price of $23.23 cannot be said to reflect damaged value because it was based on the condition of the oil after a further contamination for which the underwriters are not liable. As to the original contract price of $23.95, it was based on a BS & W specification (1.5%) which did not reflect the actual condition of the oil, which was sound (BS & W 0.8%). There can be no recovery for contamination loss as to the oil sold to Apex.

In each of the last four sales the actual condition of the oil was determined after the contract of sale had been made and the price fixed. Armada has not shown any reason why such determination could not have been made before the price was fixed. In any event, underwriters' liability must be based on the value of the oil in its actual condition, not upon a mistaken estimate of the condition and value of the oil.

Armada contends that it is entitled to recover for contamination loss on the unsold oil remaining in tank 6010. However, the amount of this oil which was contaminated (as distinct from what was sound after reconditioning) is uncertain. The court declines to make any contamination loss award for the oil remaining in tank 6010.

■ With regard to the contamination losses which are properly proved, certain findings are necessary. Armada argues that the deterioration of the oil involved in the sale of the 49,175 barrels to Sun should be measured by the difference between the original contract price to Sun ($30.55 per barrel) and the revised price, arrived at after discovery of the contamination ($27.40). This is different from the conventional method, which would use sound market value ($25.70) and a damaged value, which would obviously be lower than the sound value. However, the circumstances make it appropriate to adopt Armada's proposal. The difference between the original and revised Sun prices gives a reasonable estimate of the monetary amount of the deterioration caused by the contamination which existed at the time of the delivery to Sun. Defendants make no serious argument to the contrary. Thus, the dollar figure representing the deterioration of the 49,175 barrels delivered to Sun is $30.55—$27.40 or $3.15. The further calculations to arrive at the amount to be awarded to Armada are set forth at the end of the opinion.

In the case of the first Vanol sale and the Montello sale, the dollar values of the contamination losses can be arrived at in the normal manner. At the time of both sales the sound market value was $26.00 per barrel. In each case the price per barrel received on the sale is an appropriate measure of the damaged market value. In the Vanol sale the proper measure is value at New York, so that the price should be net of the cost of transportation from New York to Philadelphia. In the Montello sale the price should include the amount received on the settlement of the litigation. The dollar amount representing the deterioration loss on the oil sold to Vanol is $26.00—$23.58 or $2.42 per barrel. The amount for the oil sold to Montello is $26.00—$23.16 or $2.84 per barrel.

### 2. *Shortage losses.*

There are two shortage loss claims. The first relates to the loss of 8,094.572 barrels in Brazil, which has been discussed.

A second shortage loss is claimed by Armada relating to the oil delivered in New York and unloaded into various barges and tanks there. There was actually two separate discharges of the cargo—a discharge of 49,175.19 barrels to Sun, and a later discharge of 284,865.49 barrels in Bayonne at the time reconditioning was commenced. This latter figure is the amount transferred to the Bayonne tanks after being placed first on the barges. The total amount unloaded was 334,040.68 barrels. This included a certain amount of water in excess of 1.0% BS & W. A Report of Survey dated March 18, 1983, the accuracy of which has been stipulated, quantifies the amount of excess water in the second discharge as 5,816.50 barrels. Subtraction of the amount of this water yields the figure of 328,274.18 for net oil delivered. Subtracting this amount from the amount insured by the policy (348,614.572) gives the figure of 20,390.39. This is the total shortage loss figure, including the amount lost in Brazil. There is no dispute as to these figures.

There is a dispute, however, about the amount to be subtracted from this figure to take into account the deductible under the policy. Armada does not dispute that there should be a deductible of 0.5% of the shortage loss to take into account "clingage." However, the underwriters argue that there should be two deductibles.

The certificate of insurance states that losses are "payable against volume losses in excess of 0.5 percent and all risks including contamination." The policy further provides:

DEDUCTIBLES:

With respect to crude oil and its derivatives, transported in bulk, there shall be a deductible of 0.50% corresponding to natural waste, for claims resulting from spillage, shortage or loss of weight, excluding styrene, butadiene propane, butane and any other gasses transported in liquified form.

The Institute Cargo Clauses also bear upon this matter. One of the clauses states:

Including any transit by craft, raft or lighter to or from the vessel. Each craft, raft or lighter to be deemed a

separate insurance. The Assured are not to be prejudiced by any agreement exempting lighterman from liability.

The underwriters argue that the clause relating to transit by other vessels supports their contention that the removal of oil from the AGIOS NIKOLAS into barges in Bayonne involved a "separate insurance." As a separately insured event, defendants assert that a new deductible would be required.

Armada simply asserts that the language of the Institute Cargo Clauses defining "separate insurance" does not appear to "limit" the coverage of the underwriters. No explanation or analysis beyond this contention is advanced by Armada. Alternatively, Armada argues that if a second deductible does apply, the cost of that deductible should be borne by the underwriters as a sue and labor expense.

 The underwriters' interpretation seems to rest on firm grounds. The idea behind the deductible is that a certain amount of oil will "cling" to the tanks of the vessel. The deductible provision relieves the underwriters from paying for that "clingage" amount as a shortage loss. Thus, the Institute Cargo Clauses make each trip by "craft, raft or lighter" a separately insured event. With each transportation, additional amounts will be lost due to clingage, and by categorizing each voyage a separately insured event, a new deductible arises. Thus, the court finds that there are two deductibles—one relating to the voyage on the AGIOS NIKOLAS and one for the use of the barges at Bayonne.

Armada's alternative sue and labor argument will be dealt with later in this opinion.

### 3. Sue and Labor Charges

As stated earlier, the Institute Cargo Clauses, which were a part of the Brazilian insurance, contained a provision which made it the duty of the assured to mitigate damages in the event of a claim.

9. It is the duty of the Assured and their Agents, in all cases, to take such measures as may be reasonable for the purpose of averting or minimizing a loss and to ensure that all rights against carriers, bailees or other third parties are properly preserved and exercised.

All parties agree that underwriters must compensate Armada for expenses incurred under this "sue and labor" provision. Ordinary commercial expenses do not fall under the provision.

 An initial issue is whether both the London and Brazilian underwriters are liable for sue and labor expenses. The Brazilian underwriters clearly are. London underwriters say they are not. The court agrees. The London cover note does not provide for such liability as part of increased value coverage. Two witnesses testified for the London underwriters—one with respect to English practice and another concerning American practice—that increased value insurers do not participate in sue and labor expenses. No evidence was presented to the contrary.

As to the individual items, some are conceded to be proper. The Brazilian underwriters do not dispute the $440,904.50 item for steaming and storage, the $111,739.50 for the reconditioning chemicals, or the $9,499.42 for transporting those chemicals. A filing fee of $75 for a lien on the AGIOS NIKOLAS is not disputed.

The rest of the items are disputed, in whole or in part, by the Brazilian underwriters.

a. Inspection Costs: $10,121.12

 This figure relates to the costs of inspecting the cargo in order to ascertain the extent of contamination. This amount does not include the costs of two inspections connected with the Sun transaction, made in the ordinary course of business. The $10,121.12 should be allowed.

b. Customs Bond and Duty: $22,675.69
New York Spill Tax: $2,865.27

These taxes were incurred in bringing the oil to shore to be reconditioned. They are allowed.

c. Barging and Demurrage: $111,783.76

Armada incurred these expenses in unloading the oil onto barges at Bayonne so that it could be placed in tanks at Bayonne for reconditioning. These expenses are allowed.

d. Legal Expenses

■ These fall into two categories. The first is $90,819 expended in connection with the suit against the ship and negotiations to obtain its return to New York harbor. This amount is allowed.

■ The second item is $227,432 (including $9,000 in travel expenses) spent in pursuing a claim for breach of contract against Montello. This item is disallowed. Sue and labor expenses are properly incurred to minimize the loss covered by the insurance. The loss here involved is contamination loss. Thus, proper sue and labor expenses are those involved in attempting to recondition the cargo and minimize the degree of contamination. Obviously, such efforts will often be directed, as in this case, to the ultimate sale of the reconditioned cargo. However, the insurance does not actually cover the risks of a sale not being consummated. Expenses incurred solely for the purpose of concluding a sale cannot be considered sue and labor expenses recoverable from the underwriters.

Alternatively, Armada suggests that, even if the cost of suing Montello is not a sue and labor expense, a claim for this cost is proper under an alleged maritime rule that attorneys' fees are awarded to make the insured whole. *See Ingersoll Milling Machine Co. v. M/V Bodena,* 619 F.Supp. 493 (S.D.N.Y.1985). However, this case stands for no such rule. The case simply stands for the proposition that an insured may recover attorneys' fees against an insurer who improperly disclaims coverage. In the present case Armada's suit against Montello was not the result of the underwriters' disclaimer of coverage. The underwriters are not liable for Armada's expenses in that suit.

e. Travel Expenses: $9,268.34

This claim relates to the travelling expenses of Armada's representative in supervising the reconditioning process. The Brazilian underwriters concede that these expenses relate to the reconditioning of the cargo and are thus proper sue and labor expenses. However, they object to the amount. This objection has no merit. The entire $9,268.34 is allowed.

f. Unrecovered payment to vessel
 owner: $22,870.23

To obtain recovery of the vessel, Armada was required to pay the vessel owners the freight expenses connected with the cargo. As Armada's purchase was C.I.F., Petrobras was actually liable for the freight. Armada recovered from Petrobras all but $22,870.23, which Petrobras had advanced to the owners of the AGIOS NIKOLAS before the voyage. This amount was over and above the actual freight due.

■ Brazilian underwriters object to this item. This objection is overruled. It was necessary for Armada to pay this amount in order to obtain the return of the vessel. The fact that the crew demanded an amount, part of which was improperly labelled "freight," should not detract from the conclusion that this expenditure was made to minimize Armada's (and underwriters' losses). Had Armada failed to pay the amount demanded, the insured losses would have been much greater than they turned out to be. This amount is allowed.

g. Commissions: $8,559.84

Armada paid $8,559.84 in arranging for sales of the damaged cargo. This item relates solely to the selling rather than the reconditioning of the cargo. It is disallowed.

h. Interest: $284,169.59

This claim is made up of two items. The first is approximately $2,500 in interest on the $556,000 borrowed to obtain the return of the cargo to New York. The second amount of about $281,600 represents as-

sumed interest involved in carrying the oil in inventory during the reconditioning effort.

There is no real opposition to the first item. It is allowed.

On the second item, the only objection of the Brazilian underwriters is that pre-judgment interest should be awarded instead. There is no merit to this objection. The item is allowed.

It should be noted that the $281,600 item did not involve an actual out-of-pocket expense on the part of Armada. The item is the assumed cost, or economic loss, involved in holding the bulk of the cargo for a substantial amount of time while reconditioning efforts were being carried on. The Brazilian underwriters do not seriously contest that this was a cost of the reconditioning.

i. *Second deductible.*

Armada argues that even if it is subject to a second deductible, as earlier held, it should be allowed to recover the cost of that deductible as a sue and labor expense. Armada's point is that the transfer of the oil into the barges at Bayonne was a necessary step in the reconditioning process.

The item is disallowed. The Brazilian insurance cannot properly be construed as having the item subtracted under the deductible clause and then having it restored under the sue and labor provision.

E. *Liability of Banorte*

The lead Brazilian underwriter, Banorte, was served with process and is before the court. As to the other Brazilian underwriters, some have been validly served and some have not.

The orderly and lawful procedure is for Armada to be able to obtain a judgment against Banorte for the full amount owed by the Brazilian underwriters. Banorte can then recover against its co-underwriters. On the certificate of insurance—the document that Armada received regarding the Brazilian insurance—only the name of Banorte appears. The only signature on the document is that of an "Authorized Representative" of Banorte. The certificate is payable to Armada and states

We hereby certify that Petroleo Brazileiro S/A.—Petrobras—for own account or thirds insured with this company, under policy No. 21.22.0022–7 the merchandise specified below.

It is clear from the face of the document that "we" and "this company" refer to Banorte.

These certificates are customarily relied upon by C.I.F. purchasers of goods who are not privy to the underlying agreement between the supplier and the insurers. At the time it received the certificate Armada did not know the identities of the various Brazilian underwriters, except for Banorte, or the sharing arrangements among these underwriters. Banorte issued the certificate and Armada received it in the ordinary course of the C.I.F. transaction. Banorte is liable to Armada for the full amount thereunder. *See Graham Bros. Aktiebolag v. St. Paul Fire & Marine Ins. Co.,* 122 Misc. 581, 204 N.Y.S. 551 (Sup.Ct.1924).

## VI

### APPORTIONMENT BETWEEN BRAZILIAN AND LONDON UNDERWRITERS

Brazilian underwriters claim that they insured the cargo at $25.70 per barrel. This is the C.I.F. purchase price that Armada paid for the cargo. However, as noted in the certificate and in the policy, the Brazilian underwriters insured C.I.F. plus 10%. This means that they insured the cargo at $28.27. The Brazilian underwriters' expert admitted as much.

The London underwriters insured the cargo for the increased value up to $30.55 per barrel. The increased value insured was thus $2.28 per barrel, which is 7.5% of the $30.55 total amount insured. The Brazilian underwriters are to bear the balance of 92.5% of the losses. These percentages apply to the shortage and contamination losses.

## VII
## CALCULATION OF LIABILITY

Shortage Claim:

| | | |
|---|---|---|
| Actual shortage | | 20,390.39 bbls. |
| Deductibles | | |
| Vessel | 1,743.07 | |
| Barge | 1,743.07 | |
| Total | 3,486.14 | 3,486.14 bbls. |
| Insured shortage | | 16,904.25 bbls. |

Respective liability:

| | |
|---|---|
| Banorte ($28.27 per barrel) | $477,883.15 |
| London ($2.28 per barrel) | 38,541.69 |
| Total for shortage claim | $516,424.84 |

Contamination Claim: (Proven)

Sun Oil parcel:

| | | |
|---|---|---|
| Sound Market Value | $ | 25.70 |
| Loss of Value | | 3.15 |
| Percentage Loss | | |
| (Loss of value divided by sound value) | | 12.26% |
| Insured Loss (per barrel) | | |
| Banorte ($28.27 per barrel) | | 3.47 |
| London ($2.28 per barrel) | | .28 |
| Amount sold | | 49,175.19 bbls. |
| Liability | | |
| Banorte | | 170,637.93 |
| London | | 13,769.05 |

Vanol parcel (first):

| | | |
|---|---|---|
| Sound Market Value | $ | 26.00 |
| Loss of Value | | 2.42 |
| Percentage Loss | | 9.30% |
| Insured Loss (per barrel) | | |
| Banorte ($28.27 per barrel) | | 2.63 |
| London ($2.28 per barrel) | | .21 |
| Amount sold | | 101,047.75 bbls. |
| Liability | | |
| Banorte | | 265,755.58 |
| London | | 21,220.03 |

Montello parcel:

| | | |
|---|---|---|
| Sound Market Value | $ | 26.00 |
| Loss of Value | | 2.84 |
| Percentage Loss | | 10.92% |
| Insured Loss (per barrel) | | |
| Banorte ($28.27 per barrel) | | 3.09 |
| London ($2.28 per barrel) | | .25 |
| Amount sold | | 49,110.26 bbls. |
| Liability | | |
| Banorte | | 151,750.70 |
| London | | 12,277.57 |

Sue and Labor Expenses:

| | | |
|---|---|---|
| Inspection Costs | $ | 10,121.12 |
| Filing Fees | | 75.00 |
| Customs Bond & Duty | | 22,675.69 |
| New York Spill Tax | | 2,865.27 |
| Attorneys' Fees | | 90,819.00 |
| Steaming and Storage | | 440,904.50 |

| Sue and Labor Expenses: | |
|---|---|
| Travel Expenses | $ 9,268.34 |
| Unrecovered Payment | 22,870.23 |
| Reconditioning Chemicals | 111,739.50 |
| Transportation of Chemicals | 9,499.42 |
| Interest | 284,169.59 |
| Barging and Demurrage | 111,783.76 |
| Total | $1,116,791.42 |
| **Total Liability:** | |
| Banorte | $2,182,818.78 |
| London underwriters | 85,808.34 |

Prejudgment interest should be awarded in admiralty cases in the absence of extraordinary circumstances. *Mitsui & Co., Ltd. v. American Export Lines*, 636 F.2d 807, 823 (2d Cir.1981). No extraordinary circumstances are claimed by defendants. Interest is awarded beginning January 1, 1983. The parties will suggest the appropriate interest rate in their proposed judgment.

There have been advances by Brazilian and London underwriters to Armada. On June 4, 1984 Banorte advanced Armada $1,000,000. On June 30, 1984 London underwriters advanced $100,000 to Armada on the account of the increased value claim. Credit is due for these advances.

Settle judgment.

SO ORDERED.